# United States Court of Appeals
## For the First Circuit

No. 22-1944

UNITED STATES OF AMERICA,

Appellee,

v.

ANTONIO SANTONASTASO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Montecalvo, Thompson, and Rikelman,
Circuit Judges.

Jin-Ho King, with whom Milligan Rona Duran & King LLC was on brief, for appellant.
Mark T. Quinlivan, Assistant United States Attorney, with whom Joshua S. Levy, Acting United States Attorney, was on brief, for appellee.

April 26, 2024

**MONTECALVO, <u>Circuit Judge</u>.** Defendant-appellant Antonio Santonastaso appeals the judgment following a jury verdict finding him guilty of making a false statement to federal investigators and attempted witness tampering. Santonastaso contends that the government's evidence was insufficient to prove his guilt on these charges and that the district court erred by declining to give a materiality instruction based on the Supreme Court's decision in <u>Maslenjak</u> v. <u>United States</u>, 582 U.S. 335 (2017). For the reasons explained below, we affirm Santonastaso's convictions.

## I. Background

### A. The 2000 Helicopter Theft and Revocation of Santonastaso's Airman Certificate

In the summer of 2000, Santonastaso was investigated by the Federal Aviation Administration ("FAA") for allegedly stealing a helicopter and flying the helicopter without appropriate certifications. The FAA revoked Santonastaso's airman certificate after finding, in relevant part, that he: (1) lacked a valid medical certificate while flying the helicopter; (2) failed to obtain the necessary rotorcraft-helicopter rating on his airman certificate before flying the helicopter; (3) operated the helicopter carelessly or recklessly by carrying a passenger when he lacked proper certifications; and (4) failed to notify the FAA of his address change.

As Santonastaso emphasizes on appeal, the FAA did not list his alleged involvement in the helicopter theft as a reason for revoking his airman certificate. But in 2002, Santonastaso pled guilty in Massachusetts state court to stealing the helicopter.

## B. The FAA's 2018 Investigation

Nearly two decades later, in 2018, Santonastaso's neighbor reported to local police that he saw Santonastaso flying a helicopter from his backyard around the area. The police alerted the FAA, and the FAA assigned Aidan Seltsam-Wilps, an aviation safety inspector, to investigate Santonastaso. At Seltsam-Wilps's instruction, Santonastaso's neighbor provided the FAA with written logs of when he saw Santonastaso flying and photographs of Santonastaso in the helicopter.

After obtaining the logs and photographs from Santonastaso's neighbor, Seltsam-Wilps checked FAA records to assess what certifications Santonastaso possessed and whether the helicopter he was flying was airworthy (i.e., compliant with federal regulations and safe to fly). Seltsam-Wilps's research revealed that Santonastaso previously held an airman certificate, but the FAA revoked his certificate, meaning that Santonastaso did not have privileges to fly the helicopter. And by searching for the helicopter's tail number to obtain its registration

information, Seltsam-Wilps found that the helicopter appeared airworthy.

Based on this preliminary investigation, Seltsam-Wilps sent Santonastaso a letter requesting that he provide records to confirm the helicopter's airworthiness. Seltsam-Wilps found Santonastaso's responses to be inadequate and arranged to visit Santonastaso to see the helicopter in person.

On April 18, 2018, Seltsam-Wilps -- accompanied by an FAA maintenance inspector and a local police officer -- met Santonastaso at his home. At first, Santonastaso denied illegally flying the helicopter. But after Seltsam-Wilps told him that the FAA had photographic evidence of him flying, Santonastaso changed course to assert that he had the requisite certifications to fly. Similarly, when Seltsam-Wilps summarized the FAA records showing that his airman certificate had been revoked, Santonastaso "seemed very confused," but then told Seltsam-Wilps that he had a valid license to fly. Santonastaso presented Seltsam-Wilps with a logbook containing an expired temporary airman certificate issued in 1985 and expired logbook endorsements (statements issued by certified flight instructors permitting students with specific training to conduct certain types of flight operations) showing that he had completed the training requirements for the Robinson R22 helicopter he had been flying. Santonastaso also showed

- 4 -

Seltsam-Wilps what he purported to be a medical certification but was actually an inapplicable physician's checklist.

When Seltsam-Wilps inquired about Santonastaso's awareness that his airman certificate had been revoked, Santonastaso initially stated that he never received notice from the FAA about the revocation. But he later told Seltsam-Wilps that the notice must have been sent to him "when [he] was out of the country working for the State Department." Seltsam-Wilps asked Santonastaso about this supposed State Department work, to which Santonastaso responded that he had been "part of a team of operatives, and it's black ops sort of stuff," involving members of the CIA and DEA. Santonastaso further explained that the "whole story about the stolen helicopter and [his] jail time . . . was all a cover-up; and once he spoke with the remaining members of his team of operatives, he would be able to clear [the] matter up," as it was "all a big misunderstanding."

At the end of this meeting, Seltsam-Wilps instructed Santonastaso to stop flying the helicopter, citing the serious consequences that could result if the FAA found that he had violated federal regulations. Later that day, Santonastaso called Seltsam-Wilps to reiterate that he had an airman certificate and medical certification, and "indicated that he had no intention of [refraining from] flying the helicopter."

True to his word, Santonastaso continued flying, and the FAA received documentation from his neighbor of approximately 85 flights that he piloted in the helicopter between April and November 2018. But in November 2018, the Town of East Brookfield sued Santonastaso in Massachusetts state court and eventually obtained a permanent injunction barring him from flying the helicopter.

## C. The U.S. Department of Transportation's 2019 Investigation

While the FAA's investigation of Santonastaso was administrative in nature, the Office of the Inspector General of the U.S. Department of Transportation ("DOT-OIG") later opened a criminal investigation into Santonastaso's conduct. In the spring of 2019, the DOT-OIG received a complaint from the U.S. Attorney's Office regarding Santonastaso's alleged operation of a helicopter without an airman certificate. DOT-OIG Special Agent Marybeth Roberts obtained a copy of the FAA's investigation file and started the DOT-OIG's criminal investigation into Santonastaso's conduct.

On April 17, 2019, Roberts and another DOT-OIG special agent met with Santonastaso at his home. As part of her introduction, Roberts identified herself as a federal law enforcement officer, informed Santonastaso of his right to not speak with her, and explained that lying to a federal law enforcement officer is a criminal offense. Roberts also gave

Santonastaso her business card, which listed her position as a DOT-OIG special agent.

Like Seltsam-Wilps, Roberts questioned Santonastaso about the revocation of his airman certificate. Santonastaso told Roberts that he found out about the revocation during his 2018 meeting with Seltsam-Wilps and that the revocation was related to a stolen helicopter. Roberts then showed Santonastaso a copy of the revocation notice that was sent to him in 2000, and Santonastaso confirmed that the mailing address was where he lived at the time. Unlike in his interview with Seltsam-Wilps, Santonastaso did not mention working for the State Department, CIA, DEA, or any undercover operation. Santonastaso also clarified to Roberts that he was not currently flying because his helicopter needed maintenance. And when Roberts asked for his flight logbook, he told Roberts that he kept the logbook in Woodstock, Connecticut.

On May 6, 2019, Roberts and DOT-OIG Special Agent Dwight Schwader went to Woodstock to meet Roland Toutant, the manager of Toutant Airport, and learned that Toutant was friends with Santonastaso. Based on information from Toutant, Roberts and Schwader proceeded to interview Ronald Plouffe, the manager of a nearby airport in Southbridge, Massachusetts. While being interviewed by Roberts and Schwader, Plouffe received a call from Santonastaso. Plouffe clandestinely signaled to the agents that Santonastaso was on the line, and Schwader leaned in closely to

the phone receiver to take notes on the call. Santonastaso told Plouffe that a woman was "asking questions" about him at "other airports" because "his neighbor was mad" about him flying his helicopter. Of particular relevance here, Schwader's notes from the call indicated that Santonastaso referred to the woman as "a girl from MA DOT," presumably shorthand for the Massachusetts Department of Transportation. During the call, Santonastaso instructed Plouffe to say that he did not know Santonastaso or anything else in response to the woman's questions. Santonastaso also referenced the permanent injunction that prohibited him from flying and the potential consequences of doing so.

**D. The Federal Criminal Proceedings Against Santonastaso**

On May 30, 2019, a federal grand jury indicted Santonastaso on four counts:

- Count 1: Serving as an airman without an airman certificate when flying the helicopter in 2018 in violation of 49 U.S.C. § 46306(b)(7);
- Count 2: Making false statements to federal investigators by denying culpability in the 2000 helicopter theft during the FAA's 2018 investigation in violation of 18 U.S.C. § 1001(a)(2);
- Count 3: Making false statements denying his illegal operation of a helicopter in 2018 and purporting to have medical certification during the DOT-OIG's 2019 investigation in violation of 18 U.S.C. § 1001(a)(2); and
- Count 4: Attempted witness tampering involving his call to Plouffe during the DOT-OIG's 2019 investigation in violation of 18 U.S.C. § 1512(b)(3).

- 8 -

Before Santonastaso's trial began, and as will be explained in further detail, Santonastaso's counsel requested a jury instruction that incorporated the materiality standard adopted by the Supreme Court in Maslenjak. See 582 U.S. at 338, 350. The district court declined to give Santonastaso's proposed instruction.

In late March 2022, the government proceeded to try its case against Santonastaso on the same four counts from the grand jury indictment. At the close of the government's case-in-chief, Santonastaso made a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29 and renewed the motion at the close of evidence. The court denied the motion. Santonastaso's counsel noted his objection to the court's denial. After a five-day trial, the court charged the jury, and Santonastaso's counsel objected to the court's rejection of his preferred materiality instruction.

The jury found Santonastaso guilty on Counts 1, 2, and 4, and not guilty on Count 3. Santonastaso filed a post-judgment motion for judgment of acquittal on Counts 2 and 4. On May 25, 2022, the district court entered a one-line text-only order denying the motion.

On November 30, 2022, after the sentencing hearing, the district court entered judgment against Santonastaso. Santonastaso then filed this timely appeal challenging his conviction on Counts 2 and 4 only.

- 9 -

## II. Discussion

The parties agree that Santonastaso has preserved his challenges to the sufficiency of the evidence on Counts 2 and 4 and to the alleged instructional error.

This court reviews a preserved challenge to the sufficiency of evidence to sustain a criminal conviction under a de novo standard. See United States v. Mendoza-Maisonet, 962 F.3d 1, 11 (1st Cir. 2020). Our de novo review requires us to "examine the evidence, both direct and circumstantial, in the light most favorable to the prosecution and decide whether that evidence, including all plausible inferences drawn therefrom, would allow a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged count or crime." United States v. Cruz-Díaz, 550 F.3d 169, 172 n.3 (1st Cir. 2008). This approach does not allow us to "view each piece of evidence separately, re-weigh the evidence, or second-guess the jury's credibility calls." United States v. Acevedo-Hernández, 898 F.3d 150, 161 (1st Cir. 2018). We will "revers[e] only if the defendant shows that no rational factfinder could have found him guilty." United States v. Rodríguez-Torres, 939 F.3d 16, 23 (1st Cir. 2019).

As for preserved claims of instructional error, we deploy "a bifurcated framework." United States v. Sasso, 695 F.3d 25, 29 (1st Cir. 2012). "We review de novo questions about whether the instructions conveyed the essence of the applicable law and

review for abuse of discretion questions about whether the court's choice of language was unfairly prejudicial." Id. We will not reverse the district court's decision to reject the defendant's preferred instruction "unless the proposed instruction is itself substantively correct, was not covered (at least in substance) in the charge as given, and touched upon a salient point (such that the refusal so to instruct seriously undercut the proponent's ability to mount a particular claim or defense and caused substantial prejudice)." United States v. Simon, 12 F.4th 1, 50 (1st Cir. 2021).

We begin with Santonastaso's arguments relative to Count 2 before turning our attention to his protestations about Count 4 and note that "if [Santonastaso] prevails on the insufficiency argument, then we need not explore any of the other trial errors raised" because the Double Jeopardy Clause would attach and preclude a second trial. United States v. Pérez-Greaux, 83 F.4th 1, 12 (1st Cir. 2023); see also United States v. Orlandella, 96 F.4th 71, 83 n.19 (1st Cir. 2024).

## A. Sufficiency of the Evidence on Count 2 (False Statements Regarding the 2000 Helicopter Theft)

To prove Santonastaso's guilt on Count 2, the government presented evidence that, during the FAA's 2018 investigation, Santonastaso told Seltsam-Wilps that he was part of an undercover team who used the 2000 helicopter theft as a "cover-up" and thus

- 11 -

falsely denied culpability for stealing the helicopter. To establish a violation of 18 U.S.C. § 1001(a), "the government must prove that the defendant (1) made a material, false statement (2) in a matter within the jurisdiction of the government (3) knowing that the statement was false." United States v. Vázquez-Soto, 939 F.3d 365, 371 (1st Cir. 2019).

Santonastaso's appeal focuses on challenging the government's proof on the materiality element. First, and related to his jury instruction challenge, Santonastaso argues that the Supreme Court's decision in Maslenjak required the government to prove a more concrete causal connection between his false statement denying culpability for the 2000 helicopter theft and the FAA's 2018 investigation. Second, even if this court declines to adopt Maslenjak in the § 1001(a) context, Santonastaso insists that the government's materiality evidence was still insufficient under this Circuit's existing standards because his false statement "ha[d] no bearing whatsoever" on the FAA's 2018 helicopter operation investigation.

We take these two sufficiency-of-the-evidence arguments in turn, beginning with a discussion of Maslenjak. Because we ultimately conclude that the evidence was sufficient to support Santonastaso's conviction on Count 2, we then proceed to address Santonastaso's instructional error claim, which also centers around Maslenjak and the § 1001(a) materiality standard.

- 12 -

## 1. Whether <u>Maslenjak</u> Applies to § 1001(a) Prosecutions

Santonastaso urges us to read <u>Maslenjak</u>'s materiality standard into § 1001(a), enhancing the government's burden to establish a causal relationship between his false statement regarding the helicopter theft and the course of the FAA's investigation. But as will become clear, the law-of-the-circuit doctrine forecloses such a move.

In <u>Maslenjak</u>, the Supreme Court addressed the standard for obtaining a conviction premised on false statements to immigration officials under 18 U.S.C. § 1425(a), the statute prohibiting the commission of an "illegal act in connection with naturalization." 582 U.S. at 341. Maslenjak became a naturalized citizen several years after obtaining refugee status and immigrating to the United States. <u>Id.</u> at 339. But immigration officials later discovered that Maslenjak made false statements when she applied for refugee status. <u>Id.</u>

Maslenjak was then charged with, and convicted of, violating § 1425(a) based on the government's proof that she lied on her naturalization questionnaire in attesting that she never gave false information "to a government official while applying for an immigration benefit" or to gain entry to the United States. <u>Id.</u> In vacating Maslenjak's conviction, the Court summarized that "the District Court told the jury that it could convict based on any false statement in the naturalization process . . . , no matter

- 13 -

how inconsequential to the ultimate decision." Id. at 352. The Court held that such an instruction was in error because § 1425(a) requires proving that the false statement had a "causal influence" on the naturalization decision. Id. at 346-47.

The Maslenjak Court then outlined a "two-part showing" for materiality under § 1425(a). Id. at 349. The government must first "prove that the misrepresented fact was sufficiently relevant to . . . [a] naturalization criterion that it would have prompted reasonable officials . . . to undertake further investigation"; and second, the government must demonstrate that further "investigation 'would predictably have disclosed' some legal disqualification." Id. at 349-50 (emphases added) (citations omitted).

As Santonastaso notes, this Circuit has not addressed whether Maslenjak's materiality holding applies to prosecutions under § 1001(a). The government points us to the law-of-the-circuit doctrine because, in two § 1001(a) cases post-dating Maslenjak (United States v. Rivera-Ortiz, 14 F.4th 91 (1st Cir. 2021), and United States v. Chen, 998 F.3d 1 (1st Cir. 2021)), we adhered to our prior approach to assessing materiality under § 1001(a) without adopting Maslenjak's more stringent materiality standard. Santonastaso responds that Rivera-Ortiz and Chen do not trigger the law-of-the-circuit doctrine at all. Indeed, the question of whether Maslenjak's materiality holding

- 14 -

applies to § 1001(a) was not squarely before the court in either case nor did we address the issue sua sponte.

But because the law-of-the-circuit doctrine "is rooted in the need for consistency[,] . . . its force does not depend on a prior panel's use of talismanic phrases." United States v. Lewis, 517 F.3d 20, 24 (1st Cir. 2008). In other words, "[s]o long as a prior panel, in a holding directly or closely on point, makes clear its choice of a rule of law, that choice is binding on newly constituted panels within the circuit, subject only to the isthmian exceptions noted in our earlier decisions." Id.

Here, Santonastaso correctly points out that no post-Maslenjak cases in this Circuit have directly confronted Maslenjak's applicability to § 1001(a) prosecutions. Nonetheless, the panel decisions in Rivera-Ortiz and Chen implicitly made this court's "choice of a rule of law" clear. By continuing to rely on the pre-Maslenjak materiality standard in § 1001(a) cases without any consideration of Maslenjak as new binding authority, we are bound by our prior panels' interpretations of the § 1001(a) materiality element.[1] See Rivera-Ortiz, 14 F.4th at 100; Chen, 998 F.3d at 10.

_____

[1] Aside from stating the obvious that § 1425 is a different statute than § 1001, we note that the two vary significantly in terms of text and structure. In addition, none of our sister circuits have addressed Maslenjak's applicability to the § 1001(a) materiality element. Accordingly, we cannot fault our prior panels

- 15 -

Santonastaso makes no attempt to argue that either of the two exceptions to the law-of-the-circuit doctrine apply, see United States v. Barbosa, 896 F.3d 60, 74 (1st Cir. 2018) (describing exceptions), so we will not address them. We are therefore bound by the law-of-the-circuit doctrine, and we rely on the materiality standard for § 1001(a) as articulated in our pre- and post-Maslenjak cases to assess Santonastaso's sufficiency challenge on Count 2.

## 2. Whether the Government Presented Sufficient Evidence of Materiality

Under this court's materiality standard for § 1001(a) prosecutions, a false statement is material where it is "of a type which would have a 'natural tendency' to influence an investigation in the 'abstract.'" Chen, 998 F.3d at 10 (quoting United States v. Phillipos, 849 F.3d 464, 473 (1st Cir. 2017)). Importantly, "the statement need not actually have influenced the governmental function." United States v. Mehanna, 735 F.3d 32, 54 (1st Cir. 2013). Instead, "[i]t is enough that the 'statement could have provoked governmental action.'" Id. (emphasis added) (quoting United States v. Sebaggala, 256 F.3d 59, 65 (1st Cir. 2001)). Accordingly, a statement "is material regardless of whether the agency actually relied upon it," Sebaggala, 256 F.3d at 65, and

_____

for not identifying and relying upon Maslenjak as on-point binding precedent in this context.

- 16 -

"the knowledge of the interrogator is irrelevant to the materiality of the defendant's false statements," Mehanna, 735 F.3d at 54. Similarly, "where a defendant's statements are intended to misdirect government investigators, they may satisfy the materiality requirement of section 1001 even if they stand no chance of accomplishing their objective." Id. at 55.

Santonastaso argues that his statements denying culpability for the helicopter theft in 2000 were immaterial for two main reasons. First, he maintains that the FAA's 2018 investigation was solely intended to discern whether he had proper qualifications to fly the helicopter and whether the helicopter was airworthy, such that the helicopter theft in 2000 had nothing to do with either investigatory purpose. Second, he relies on the fact that in revoking his airman certificate in 2000, the FAA did not identify helicopter theft as a reason for the revocation. So, in Santonastaso's view, even to the extent that the 2018 investigation tangentially encompassed his airman certificate revocation in 2000, any statements he made about the helicopter theft could not possibly have been material.

The government responds that Santonastaso's statements were material to the FAA's 2018 investigation because "one of the purposes of the inspectors' visit with Santonastaso was to determine if the information in the FAA database might be erroneous." Furthermore, the government emphasizes that "FAA

- 17 -

safety inspectors do not have access to lists of persons who work for the CIA or other agencies in an undercover capacity," meaning Seltsam-Wilps had no way to corroborate Santonastaso's story without deeper investigation.

Although Santonastaso raises valid points about the facial irrelevance of his involvement in the helicopter theft with respect to the 2018 investigation, he falls short of the high bar to show that no reasonable jury could have convicted him under § 1001(a). A reasonable jury could have found that Santonastaso's false statement was material -- even if it was largely unrelated to the investigation at hand and his story was genuinely incredible -- by concluding that he intended to misdirect investigators. See Mehanna, 735 F.3d at 55.

And in Rivera-Ortiz, this court held that a plausible explanation for how a federal investigation "would be impacted by the false statements" was "sufficient" to show materiality. 14 F.4th at 100. Here, the government presented testimony from Seltsam-Wilps that his investigation involved confirming the accuracy of the FAA's database on revocations and he could not have readily verified Santonastaso's alleged undercover work. In the light most favorable to the government, a reasonable jury could find that, by falsely denying involvement in the 2000 helicopter theft, Santonastaso could have provoked the FAA to further investigate his purported undercover work or the accuracy of its

database.  While the government's evidence for materiality was not particularly plentiful, it was sufficient for a reasonable jury to have found Santonastaso's statements to be material.  We thus affirm the jury's guilty verdict on Count 2.

## B. Instructional Error on the Materiality Standard

Having found the evidence sufficient to sustain Santonastaso's conviction on Count 2, we turn to his instructional error claim.  In line with his arguments for applying Maslenjak's materiality holding to § 1001(a) prosecutions, Santonastaso requested a jury instruction that incorporated Maslenjak's formulation of the materiality standard.  Santonastaso's proposed instruction provided, in relevant part: "A statement is not material if it could have influenced the decisionmaker.  The government must prove, beyond a reasonable doubt, that the statement would have influenced the decisionmaker."

The court rejected Santonastaso's proposed instruction. At the close of evidence, the court gave the following instruction modeled after First Circuit Pattern Instruction 4.18.1001: "A statement is material if it has a natural tendency to influence or be capable of influencing the decision of the decisionmaker to which it was addressed, regardless of whether the agency actually relied upon it.  A statement is also material if it provokes government action."

The district court did not err in declining to give Santonastaso's proposed instruction because, as explained, this Circuit has not adopted Maslenjak's materiality holding for § 1001(a) prosecutions. And as given, the court's instruction correctly stated the controlling law on materiality. In fact, aside from urging us to determinatively hold that Maslenjak applies to § 1001(a) prosecutions, Santonastaso does not point to any other substantive legal error or prejudice caused by the district court's chosen instruction. Therefore, his instructional error claim fails.

## C. Sufficiency of the Evidence on Count 4 (Attempted Witness Tampering Involving Plouffe)

The government charged Santonastaso with attempted witness tampering based on his call to Plouffe instructing him not to speak with a woman who was investigating him, all while DOT-OIG special agents were incidentally present to interview Plouffe regarding Santonastaso. A person who "knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to . . . hinder, delay, or prevent the communication to a law enforcement officer . . . of information relating to the commission or possible commission of a Federal offense," is guilty of witness tampering under 18 U.S.C. § 1512(b)(3).

Santonastaso argues that the government failed to prove the specific intent element of witness tampering because Santonastaso "acted with state-law matters in mind and without any intent in connection with any potential federal offense." In particular, Santonastaso describes that approximately two weeks after DOT-OIG agents met with him in April 2019, he received notice of the permanent injunction barring him from flying that was issued by the Worcester County Superior Court. And just four days after the permanent injunction was issued, Santonastaso called Plouffe while DOT-OIG agents were present. Contending that he had "state-law matters in mind," Santonastaso characterizes his conversation with Plouffe as centering around the recent state court proceedings with no mention of the federal investigation. Additionally, he points out that DOT-OIG Special Agent Schwader's notes reflect that Santonastaso told Plouffe that "a woman from the '[MA] DOT'" was investigating him, while DOT-OIG Special Agent Roberts explicitly introduced herself as a federal agent and gave Santonastaso a business card identifying her as a federal agent.

In United States v. Baldyga, 233 F.3d 674 (1st Cir. 2000), we "dispel[led] any notion that the defendant's intent to hinder communication must include an awareness of the possible involvement of federal officials." Id. at 680. There, we explained that "Section 1512 explicitly does not require proof of the defendant's state of mind with respect to whether the officials

- 21 -

involved were federal officers." Id. As such, "the evidence may be sufficient to support a conviction under § 1512(b)(3) even if the defendant had no knowledge that the witness threatened had even contemplated communicating with a federal official." Id. at 680-81.

Presumably to evade the clear rule we set in Baldyga, Santonastaso appears to argue that he lacked specific intent to interfere with an investigation into a "potential federal offense," rather than knowledge that federal agents were involved in the investigation. But in Baldyga, we emphasized that "[a]ll that § 1512(b)(3) requires is that the government establish that the defendants had the intent to influence an investigation that happened to be federal." 233 F.3d at 681 (quoting United States v. Applewhaite, 195 F.3d 679, 687 (3d Cir. 1999)); see also Applewhaite, 195 F.3d at 687 (summarizing that in a § 1512(b)(3) prosecution, "[t]he government did not have to establish that the defendants specifically intended to interfere with a federal investigation"). Likewise, we held in United States v. Byrne, 435 F.3d 16 (1st Cir. 2006), that "a defendant may be held strictly liable under [§ 1512(b)(3)] for the happenstance that a federal law enforcement agent rather than, say, a local police officer or internal affairs specialist investigated his conduct." Id. at 25. Consequently, for specific intent purposes under § 1512(b)(3), there is no meaningful distinction between intent related to the

federal status of the investigating agents and the federal nature of the crime being investigated.

Under the standards we have adopted in Baldyga and Byrne, we must uphold the jury's guilty verdict on this record. In addition, we note that the government presented detailed evidence related to Santonastaso's knowledge of the involvement of federal officials in a federal investigation. For example, as the government highlights, Santonastaso did not limit his discussion with Plouffe to complaining about the state court proceedings. Instead, Santonastaso told Plouffe that a woman investigating his helicopter flying was asking questions about him at airports. And in fact, after interviewing Santonastaso and informing him of her status as a federal agent, Roberts visited Toutant, Santonastaso's friend, at an airport just before meeting Plouffe at the Southbridge Airport. Moreover, Santonastaso instructed Plouffe to avoid revealing any information if asked by the female investigator.

Although Santonastaso did not refer to Roberts by name and Schwader's notes implied that Santonastaso said that the woman worked for the Massachusetts DOT, a rational jury could have inferred that Santonastaso had Roberts in mind. And, again, because Santonastaso had recently been interviewed by Roberts, who was indeed investigating a federal crime and clearly explained to Santonastaso that she was a federal agent, the jury could sensibly

deduce that he was specifically thinking of the federal investigation when he called Plouffe. Therefore, the jury reasonably concluded that Santonastaso knowingly attempted to influence Plouffe during a federal investigation conducted by federal law enforcement agents, and we affirm its guilty verdict on Count 4.

### III. Conclusion

For the foregoing reasons, we conclude that the evidence was sufficient for the jury to find Santonastaso guilty of making a false statement to federal investigators and attempted witness tampering, and the district court did not commit instructional error in rejecting Santonastaso's proposed materiality instruction. We therefore affirm the underlying convictions for those charges against Santonastaso.